**LAUNDRY OPERATING COMPANY, d/b/a Dixie Laundry & Dry Cleaning Company, Appellant,**

**v.**

**SPALDING LAUNDRY & DRY CLEANING COMPANY, Appellee.**

Court of Appeals of Kentucky.

June 12, 1964.

As Modified on Denial of Rehearing Nov. 20, 1964.

Fielden Woodward, Kenneth L. Anderson, Louisville, for appellant.

J. Royden Peabody, Jr., Carl L. Wedekind, Jr., Louisville, for appellee.

PALMORE, Judge.

This is an action by one laundry company against another for triple damages resulting from the alleged violation of KRS 365.-030(1). KRS 365.070(1). The plaintiff (hereinafter called Dixie) appeals from a summary judgment entered against it on the basis of pre-trial depositions, opening statement of counsel, and the testimony of its president and chief witness. It was agreed that no further or additional facts in support of the complaint would have been developed in the course of the trial. Hence the question on appeal is whether, admitting all that the plaintiff proved and said it could prove, a favorable verdict would have been authorized.

Dixie does laundry and dry cleaning only. The defendant company (hereinafter called Spalding), in addition to these types of work, also offers a linen service for industrial or institutional customers, in which clean linens are provided on a rental basis. In the summer of 1960 Spalding's sales representatives, while engaged in an effort to extend its linen service business with local motels and nursing homes, solicited some of Dixie's regular customers and, by way of an introductory offer, gave them two weeks' free service. These customers thereafter switched to the linen service and ceased patronizing Dixie. Their business with Dixie had amounted to some $160 per week.

Dixie made a complaint to the Greater Louisville Laundry Owners Association, of which both parties were members, and the matter was brought up for discussion at a meeting of the association. Spalding admitted it had given the free service and promised it would not make any more such trial offers to customers of other laundries. According to Spalding, this gesture was made in order to keep peace, and was not intended as an admission that the practice was illegal or unethical.

Spalding's discontinuance of the practice of giving two weeks' free linen service to customers of its competitors did not, of course, effect a restoration of the customers already lost by Dixie.

KRS 365.030(1), part of the Unfair Practices Act enacted in 1936, reads as follows:

"Except as provided in KRS 365.040, no person engaged in business within this state shall sell, offer for sale or advertise for sale any article or product, or service or output of a service trade, at less than the cost thereof to such vendor, or give, offer to give or advertise the intent to give away any article or product, or service or output of a service trade, *for the purpose of injuring competitors and destroying competition.*" (Emphasis added.)

The principal basis on which the trial court granted summary judgment dismissing the claim was that there was not sufficient evidence to support a finding that Spalding had intended to injure competitors and destroy competition. A second reason assigned for the dismissal was Dixie's inability to prove its damages with sufficient exactitude (this being a suit for damages only).

Neither our research nor that of counsel for the respective parties has uncovered any precedents, foreign or domestic, that are particularly helpful in deciding the main question in the case. See, however, annotations at 118 A.L.R. 506 and 128 A.L.R. 1126. It seems to have been the feeling of the trial court that because Spalding bore no ill will toward Dixie, and was motivated primarily by a desire to increase its own business rather than a specific purpose to injure Dixie, there can be no justifiable inference of a purpose to injure competitors and destroy competition. This, we believe, ignores the realities of life.

There are many instances in which sales efforts may create new business where none existed before, but when a seller of goods or services solicits the business of a customer whose acquisition he knows will result in a loss of that customer by a competitor, the intent to bring about that loss is inextricable from the intent to effect a gain in business for the proselyter. They are one and the same. "It may be presumed in a civil action that the natural and probable consequences of the act were intended by the actor." Dikeou v. Food Distributors Ass'n, 107 Colo. 38, 108 P.2d 529, 534 (1940). In "Through the Looking Glass" we are told the walrus shed copious tears as he devoured the innocent oysters who had accepted his invitation to stroll along the beach. He meant them no harm, of course. He merely wished to eat them.

We do not suggest that a purpose to divert or capture a competitor's business is wrong or unethical. It is perfectly legitimate so long as it is not carried out unfairly. The legislature simply has declared it unfair to accomplish it through giving away goods or services or selling them for less than cost.

In calling on business establishments known to be customers of its competitors Spalding was bound to realize that the success of its efforts would result in loss and injury to the competitors. Hence the result was necessarily embraced within its purpose. It is contended, however, that the intent to "destroy competition" is a separate element, different from the intent to injure competitors. Indeed, it was so stated in State, by Clark v. Wolkoff, 250 Minn. 504, 85 N.W.2d 401 (1957), though the opinion conveniently (and understandably) omits an explanation of the difference. In California, where the law originated, the word "and" was later amended to "or," thus eliminating this particular exercise in semantic gymnastics. Our

opinion is that to the extent a competitor is caused to lose business, competition is destroyed. It would hardly be in keeping with common sense to hold that activities otherwise falling within the interdict of the statute would be proper so long as the intent of the guilty party is something short of a design to effect the complete destruction of competition. Considering the nature and policy of the statute, we think the expressions "injuring competitors" and "destroying competition" were intended to describe one thing rather than two, that is, a reduction of competition at the expense of a competitor.

The giving of free service to a competitor's customer with the admitted object of obtaining that customer's patronage is an obvious and flagrant violation of the statute. To hold otherwise would defeat the unmistakable purpose of the law. Spalding having admitted, by the deposition of its chief officer, the activities in question, it seems to us that it was in violation of KRS 365.030(1) as a matter of law, leaving for the jury the questions of causation [1] and damages.

On the issue of damages Mr. Bruner, Dixie's president, testified in substance that he had no cost accounting system, but that his fixed costs were not affected by the loss of these few accounts and his variable costs amounted to 50% or less of gross sales. He estimated, therefore, that his damages amounted to at least 50% of the gross sales lost. We cannot agree with Spalding that this testimony constituted insufficient evidence of "actual" damages for submission to a jury. The lack of a cost accounting system is not fatal. The allocation of "costs" to various products and services quite often is set up on an arbitrary basis anyway. Bruner knew that on his volume over and above the "break-even" point net profits ran about 50%. Our deci-

1. One of the customers gave testimony from which the jury might have concluded that the transfer to Spalding's linen serv- ice resulted from dissatisfaction with Dixie's service rather than the free trial.

sions in Jefferson Ice & Fuel Co. v. Grocers Ice & Cold Storage Co., Ky., 286 S.W.2d 80, 54 A.L.R.2d 1181 (1956) and Grocers Ice and Cold Storage Co. v. Jefferson Ice & Fuel Co., Ky., 311 S.W.2d 186 (1958), do not suggest that the accounting methods therein mentioned are exclusively requisite.

That Dixie's income tax returns showed losses in previous years was evidence to be considered by the jury, but was not necessarily inconsistent with Bruner's estimate that on the volume of business lost to Spalding Dixie's out-of-pocket loss was approximately 50%. In fact, from the damage standpoint there is no difference between a decreased profit and an increased loss. We do not commend loose accounting, but at the same time are of the opinion that it would be unreasonable to make a precise accounting system an absolute requisite to a showing of damage to a business. It is our judgment that Dixie was entitled to have the amount of its damage considered and assessed by the jury.

The judgment is reversed for further proceedings consistent with this opinion.