**DREAMWERKS PRODUCTION GROUP, INC., Plaintiff–Appellant,**

v.

**SKG STUDIO, dba DreamWorks SKG, Defendant–Appellee.**

No. 96–55595.

United States Court of Appeals, Ninth Circuit.

Argued June 4, 1997.

Submission Deferred June 6, 1997.

Submitted April 21, 1998.

Decided April 21, 1998.

Kenneth R. Umans, Colluci & Umans, New York City, Surjit P. Soni, Sheldon & Mak, Pasadena, California, for plaintiff-appellant.

Cathleen Collins, Kinsella, Boesch, Fujikawa & Towle, Los Angeles, California, for defendant-appellee.

Before: BROWNING, FLETCHER, and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge.

Dreamwerks, a company hardly anyone has heard of, sues entertainment colossus DreamWorks SKG, claiming trademark infringement. This is the reverse of the normal trademark infringement case, where the well-known mark goes after a look-alike, sound-alike, feel-alike unknown which is trying to cash in on the famous mark's goodwill. The twist here is that Dreamwerks, the unknown, was doing business under that name long before DreamWorks was a twinkle in Hollywood's eye. Dreamwerks is therefore the senior mark, and it argues that its customers will mistakenly think they are dealing with DreamWorks, the junior mark.

## Facts

Everyone—or most everyone—has heard of DreamWorks SKG, established in 1994 by what many consider the three hottest names in Hollywood: Steven Spielberg, Jeffrey Katzenberg and David Geffen (each of whom graciously contributed an initial to form the SKG part of the trademark). DreamWorks is a film studio, having produced such well-advertised movies as *The Peacemaker, Amistad* and *Mouse Hunt.* Like other movie studios, DreamWorks participates more generally in the entertainment business, having created DreamWorks Interactive (a joint venture with software giant Microsoft); GameWorks (described in the press as a micropub and virtual reality video arcade for the 90s); and DreamWorks Toys (a joint venture with toy maker Hasbro).

Less well known is Dreamwerks Production Group, Inc., a small Florida company that since 1984 has been in the business of organizing conventions in the Northeast and Midwest, mostly with a Star Trek theme. At a typical Star Trek convention, Dreamwerks draws customers with a star like DeForest Kelley (Bones), Leonard Nimoy (Spock) or Michael Dorn (Worf from *The Next Generation* ). For an admission fee of $25 or so, customers get autographs, meet fellow trekkies, compete in costume contests, listen to pitches for upcoming movies and browse the products of vendors who have rented space at the convention. Dreamwerks sometimes presents previews of science fiction and ad-

venture/fantasy movies produced by the major studios, such as *Batman Returns, Dracula, Aladdin* and *Jurassic Park*. Dreamwerks clearly caters to the pocket-protector niche, and its convention business has never really taken off. But the longevity of the enterprise illustrates its remarkable resilience, not unlike the starship itself.

Because Dreamwerks registered its mark with the United States Patent and Trademark Office in 1992, it holds the senior mark and is the plaintiff here. It claims that DreamWorks SKG is causing confusion in the marketplace by using a mark too similar to its own and is doing so with respect to goods and services that are too similar to those it (Dreamwerks) is offering.

Pshaw, one might say. What could be better for Dreamwerks than to have people confuse it with a mega movie studio? Many an infringer has tried to manufacture precisely such confusion and thereby siphon off the goodwill of a popular mark. *See, e.g., E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir.1992) ("Gallo" wine and "Joseph Gallo" cheese). Not so, answers Dreamwerks, apparently in earnest. It is not interested in fooling consumers, and it claims to suffer ill will when people buy tickets under the misimpression that they are dealing with DreamWorks rather than Dreamwerks. Dreamwerks also frets that its own goodwill will be washed away by the rising tide of publicity associated with the junior mark. Dreamwerks points out (somewhat wistfully) that it hopes to expand its business into related fields, and that these avenues will be foreclosed if DreamWorks gets there first. Finally, Dreamwerks notes that whatever goodwill it has built now rests in the hands of DreamWorks; if the latter should take a major misstep and tarnish its reputation with the public, Dreamwerks too would be pulled down.

These are not fanciful or unreasonable concerns, though they may be somewhat exaggerated by the hope of winning an award or settlement against an apparently very solvent DreamWorks. We are not, however, in a position to judge the extent to which these harms are likely, nor whether they are somehow offset by any extra goodwill plaintiff may inadvertently reap as a result of the confusion between its mark and that of the defendant. These are matters for the trier of fact. The narrow question presented here is whether Dreamwerks has stated a claim for trademark infringement sufficient to survive summary judgment. The district court held that Dreamwerks had not because the core functions of the two businesses are so distinct that there is no likelihood of confusion as a matter of law. Dreamwerks appeals, and it is that ruling we review de novo. *See Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1287 (9th Cir.1992).[1]

### Discussion

The test for likelihood of confusion is whether a "reasonably prudent consumer" in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks.[2] In *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), we listed eight factors to facilitate the inquiry: (1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of sight, sound and meaning; (4) evidence of actual confusion; (5) marketing channels; (6) type of goods and purchaser care; (7) intent; and (8) likelihood of expansion. The factors should not be rigidly weighed; we do not count beans. "Rather, the factors are intended to guide the court in assessing the basic question of likelihood of confusion." *Gallo Winery*, 967 F.2d at 1290.

In the usual infringement case, these factors are applied to determine whether the

---

1. Only likelihood of confusion findings made after trial are reviewed for clear error under Fed. R.Civ.P. 52(a). *See Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 (9th Cir.1985) (en banc).

2. Dreamwerks alleged trademark infringement under both the Lanham Act and state common

law. Because summary judgment turns in either case on the likelihood of confusion, we treat the claims as coextensive for purposes of reviewing the district court's order. *See, e.g., Murray v. Cable Nat'l Broadcasting Co.*, 86 F.3d 858, 860 (9th Cir.1996).

junior user is palming off its products as those of the senior user. Would a consumer who finds a running shoe marked Mike be bamboozled into thinking that it was manufactured by Nike? In a reverse infringement case, like ours, there is no question of palming off, since neither junior nor senior user wishes to siphon off the other's goodwill. The question in such cases is whether consumers doing business with the senior user might mistakenly believe that they are dealing with the junior user. More specifically, the question here is whether a reasonable consumer attending a Dreamwerks-sponsored convention might do so believing that it is a convention sponsored by DreamWorks.[3]

■■■ Before performing a Vulcan mind meld on the "reasonably prudent consumer," we note that if this were an ordinary trademark case rather than a reverse infringement case—in other words if DreamWorks had been there first and Dreamwerks later opened up a business running entertainment-related conventions—there would be little doubt that DreamWorks would have stated a case for infringement sufficient to survive summary judgment.[4] The reason for this, of course, is that a famous mark like Dream-Works SKG casts a long shadow. Does the result change in a reverse infringement case because the long shadow is cast by the junior mark? We think not.[5]

■■■ Three of the *Sleekcraft* factors are pivotal here: (1) arbitrariness of the mark; (2) similarity of sight, sound and meaning; and (3) relatedness of the goods.[6] "Dreamwerks" is an arbitrary and fictitious mark deserving of strong protection.[7] Had Dreamwerks chosen a descriptive mark like Sci-Fi Conventions Inc., or a suggestive mark like Sci-Fi World, some confusion with the marks of legitimate competitors might be expected. DreamWorks argues that the word "Dream" makes the Dreamwerks mark suggestive of a company which brings sci-fi dreams to life. But "Dream" is used in too many different ways to suggest any particular meaning to the reasonable consumer.[8]

3. Or more precisely for our purposes, the question is whether the district court erred in holding that Dreamwerks had failed to establish a triable issue of fact with respect to this. The distinction is important because it requires us to draw reasonable inferences—about the workings of the entertainment industry, the mind set of trekkies attending conventions and so on—in favor of Dreamwerks.

4. The unusual posture of the case has caused DreamWorks SKG, the holder of the famous mark, to make an argument that is quite uncharacteristic for someone in its position. Namely, it argues that the plaintiff's mark (and therefore its own) deserves relatively narrow protection. DreamWorks may someday find itself in a case where its position is reversed, and discover that the arguments it made in our case come back to haunt it. *See, e.g., Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir.1990) (applying judicial estoppel).

5. In an infringement case involving "forward" confusion, a more well-known senior mark suggests greater likelihood of confusion because a junior user's mark is more likely to be associated with a famous mark. In a reverse confusion case, however, we must focus on the strength of the *junior* user's mark. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 959 (7th Cir.1992). The concern here is that convention-goers will think DreamWorks SKG is sponsoring the Star Trek conventions. So the greater the power of DreamWorks' mark in the market-place, the more likely it is to capture the minds of Dreamwerks customers.

6. The other five *Sleekcraft* factors don't provide much insight in this case and thus carry little weight.

7. Arbitrary or fanciful marks deserve wide protection because the trademark holder can properly expect to run into very little confusion from honest competitors. A fanciful mark is a coined word or phrase, such as Kodak, invented solely to function as a trademark. *See Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1390 (9th Cir.1993). An arbitrary mark, such as Dutch Boy on a can of paint, uses common words in a fictitious and arbitrary manner to create a distinctive mark which identifies the source of the product. In either case the trademark holder must work hard to make consumers associate the trademark with the product. This suggests that any association is the result of goodwill and deserves broad protection from potential infringers.

8. Consider how "Dream" works itself into the commercial lexicon:

| | |
|---|---|
| Dream Team | (the 1992 Olympic basketball team) |
| Dream Lover | (a movie) |
| Dream Land | (an electric blanket manufacturer) |
| Dream Weaver | (a new Web page editor) |
| Dreamcoat | (Joseph and the Amazing Technicolor . . .) |

At best, "Dreamwerks" conjures images related to fantasy, hope or reverie. It's too great a mental leap from hopes to Star Trek conventions for us to treat the mark as suggestive. The Dreamwerks mark deserves broad protection.

Sight, sound and meaning is easy. There is perfect similarity of sound, since "Dreamwerks" and "DreamWorks" are pronounced the same way. There is also similarity of meaning: Neither literally means anything, and to the extent the words suggest a fantasy world, they do so equally.[9] Similarity of sight presents a slightly closer question. The man-in-the-moon DreamWorks logo, when presented in the full regalia of a movie trailer, is quite distinctive. But "Dream-Works" often appears in the general press and in Industry magazines without the logo, leaving only the slight difference in spelling. Spelling is a lost art; many moviegoers might think that Mirimax and Colombia Pictures are movie studios. Moreover, a perceptive consumer who does notice the "e" and lower-case "w" in Dreamwerks might shrug off the difference as an intentional modification identifying an ancillary division of the same company. While we recognize that spelling matters, we're not sure substituting one vowel for another and capitalizing a middle consonant dispels the similarity between the marks.

The clincher is the relatedness of the goods. Twenty years ago DreamWorks may have had an argument that making movies and promoting sci-fi merchandise are different businesses promoting different products.

But movies and sci-fi merchandise are now as complementary as baseball and hot dogs. The main products sold at Dreamwerks conventions are movie and TV collectibles and memorabilia; the lectures, previews and appearances by actors which attract customers to Dreamwerks conventions are all dependent, in one way or another, on the output of entertainment giants like DreamWorks.

The district court emphasized that Dreamwerks has carved out a narrow niche in the entertainment marketplace, while Dream-Works controls a much broader segment. Dreamwerks targets trekkies; DreamWorks targets everyone. But the relatedness of each company's prime directive isn't relevant. Rather, we must focus on Dreamwerks' customers and ask whether they are likely to associate the conventions with DreamWorks the studio. Entertainment studios control all sorts of related industries: publishing, clothing, amusement parks, computer games and an endless list of toys and kids' products. In this environment it's easy for customers to suspect DreamWorks of sponsoring conventions at which movie merchandise is sold.[10] Other studios are rapidly expanding their merchandising outlets: Universal Studios has theme parks in California, Florida and Japan with dozens of stores selling movie-related products, and Disney is helping transform New York's Times Square into a G-rated shopping center. Dreamwerks convention-goers might well assume that DreamWorks decided to ride the coattails of Spielberg's unparalleled reputation for sci-fi/adventure films (*Jaws, E.T., Close Encoun-*

---

DreamWriter (a line of laptop computers)
Dreamgirls (a Broadway show)
Dreamwatch (a sci-fi magazine)
DreamPerks (a promotion by Northwest Airlines).

9. "Dreamwork" seems to have two more specific but lesser-known meanings. In psychiatry, "dream-work" is a term coined by Sigmund Freud to refer to the work a dream does by bringing out one's fears, anxieties and hopes, thereby helping balance one's personality. *See* Sigmund Freud, *The Interpretation of Dreams* 174–75 (A.A. Brill trans., Random House 1950). The term "dreamwork" has even spilled over into academic film analysis, where the viewing of a film (sitting in the dark, passive) is often analogized to a dream. *See, e.g.,* Paul Coates, *The Sense of an Ending: Reflections on Kieslowski's*

*Trilogy,* Film Quarterly, Dec. 1, 1996 (discussing dreamwork in *Blue* ). Since we can hardly expect the reasonable consumer to discover this film-specific meaning, we think it is appropriate to also treat the DreamWorks mark as simply calling to mind vague notions of fantasy, hope or reverie.

10. According to Jeffrey Katzenberg's deposition testimony, DreamWorks has no current plans to sponsor conventions. But DreamWorks does not dispute that it plans to hawk mass quantities of commercial goods in addition to the movies themselves. People attending Dreamwerks conventions may not know about Katzenberg's plans and could easily assume that DreamWorks has spun off a Star Trek marketing division.

*ters, Raiders, Jurassic Park* ) into the sci-fi merchandising business.[11]

### Conclusion

■■ We do not decide the ultimate question presented in this case, whether Dream-Works SKG infringes the trademark held by Dreamwerks Production Group, Inc. We only remand for trial. While it is somewhat unusual for a famous mark to defend its very existence against a much lesser known mark, DreamWorks is in no different a position than any other new company which must ensure that its proposed mark will not infringe on the rights of existing trademark holders. Counsel for DreamWorks conducted a diligent search and discovered the Dreamwerks mark, yet failed to make accommodations or select a different mark.[12] Counsel complains that a ruling in favor of Dreamwerks will leave little room for new marks to develop, since almost every combination of words has been taken by someone doing business somewhere in what may be a loosely related field. But this is not true of fanciful marks—marks that have no connection to the product or service offered. Fanciful marks not only give the trademark holder a pristine legal landscape, they also add to the splendor of our language by giving us new ways to express ourselves. If you received junk e-mail, you were Spammed. The childish antics of politicians are Mickey

Mouse. Lousy, mindless work is a McJob. A quick fix is a Band-Aid. Glitz and ditz make for a Barbie World. Calling something the Rolls Royce of its class is shorthand for referring to a refined product targeted at those with expensive tastes. And maudlin family gatherings make for Kodak moments. None of these phrases had any meaning before the trademark was absorbed into the language; each is evidence of how commerce and culture transform each other. A clever new trademark diversifies both the marketplace and the marketplace of ideas; a takeoff or copy of a mark, even if accidental, adds nothing but confusion. This dispute could have been avoided had DreamWorks been more careful, or a tad more creative, in choosing its name.

■■ We REVERSE and REMAND for further proceedings consistent with this opinion.[13]

---

**11.** Promoting sci-fi merchandise may or may not amount to the same thing as sponsoring conventions. But how would a Dreamwerks customer know the difference? If an entertainment studio can own the movie, the theatres which show the movie, the newspapers which list the movie, the television networks which advertise the movie, the magazines which review the movie, the stores which sell the toys, clothing and posters associated with the movie, the amusement parks with rides based on the movie and the rights to the movie-related merchandise itself, then why wouldn't a studio also sponsor a convention which celebrates movies and sells movie-related products?

**12.** Absence of malice is no defense to trademark infringement:

In "Through the Looking Glass" we are told the walrus shed copious tears as he devoured the innocent oysters who had accepted his invitation to stroll along the beach. He meant them no harm, of course. He merely wished to eat them.

3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:124 (4th ed.1997) (quoting *Laundry Operating Co. v. Spalding Laundry & Dry Cleaning Co.*, 383 S.W.2d 364, 366 (Ky.1964)).

**13.** Because Dreamwerks' claims for common law trademark infringement and state law unfair competition also turn on the likelihood of confusion, we reverse and remand for further consideration of those claims as well.

We affirm the district court's grant of summary judgment as to Dreamwerks' state law claims for trademark dilution and tortious interference with prospective economic advantage. We agree with the district court that the Dreamwerks mark is not so well-recognized that it falls within the ambit of the anti-dilution statute. We also agree with the district court that no evidence in the record supports the view that DreamWorks "knowingly interfered with the plaintiff's expectancy." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 45 Cal.Rptr.2d 436, 447, 902 P.2d 740, 751 (1995).