Katherine WALTER, a.k.a and d.b.a. Pearl Beach, Plaintiff,

v.

MATTEL, INC.; Defendant.

No. CV–98–2048–RJK.

United States District Court, C.D. California.

Sept. 4, 1998.

Paul A. Larsen, Jack S. Yeh, Ku, Fong, Larsen & Chen, LLP, Los Angeles, CA, for plaintiff.

Adrian M. Pruetz, Steven M. Anderson, Brett L. Healy, Steven Vaughan, Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP, Los Angeles, CA, for defendant.

MEMORANDUM OF DECISION & ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS UPON CLOSE OF PLAINTIFF'S CASE

KELLEHER, District Judge.

The Court, having read and considered all papers filed in connection with this litigation, including all papers filed in connection with Defendant's Motion for Judgment on Partial Findings Upon Close of Plaintiff's Case, pursuant to FED.R.CIV.P. 52(c), and having heard testimony on August 25, 26, and 27, 1998, hereby orders as follows.

## I. INTRODUCTION

On March 23, 1998, Plaintiff Katherine Walter, also known as and doing business as

Pearl Beach ("Plaintiff") filed a Complaint for (1) false designation of origin and false deception under the Lanham Act, 15 U.S.C. § 1125(a), (2) common law unfair competition, and (3) statutory unfair competition under CAL.BUS. & PROF.CODE § 17200 *et seq.* Plaintiff, a commercial illustrator who provides illustration services and illustrations to professional clients, alleges that in 1997 Defendant Mattel, Inc. ("Mattel") misappropriated her long standing marks when it began promoting and distributing a line of "Pearl Beach Barbie" dolls, which she claims not only used her name but copied her pearl & shell logo on the product packaging as well.

On July 13, 1998, the Court heard oral argument on Plaintiff's Motion for Preliminary Injunction, wherein she sought to enjoin Mattel from using, marketing, advertising, developing, selling, distributing, or promoting any goods or services which utilize the "Pearl Beach" trade names, service marks, or trademarks including but not limited to "Pearl Beach," the Pearl & Shell logo, and/or any confusingly similar variations thereof. At that time the Court ordered the hearing consolidated with a trial on the merits, pursuant to FED.R.CIV.P. 65(a)(2).[1] Said trial was to be bifurcated from any issues of damages, and it was made clear to the parties that the Court would only consider the issues relating to Plaintiff's request for a permanent injunction. The Court set the matter down for trial to begin on August 18, 1998, which date was later changed to August 25, 1998, by stipulation of the parties.

At that July 13 hearing the Court also ordered the parties to file a Proposed Pre–Trial Conference Order ("Proposed Order") not later than July 20, 1998, and pursuant to the parties' expressed desire to be brought before a judicial settlement officer, had the matter referred to the Hon. Harry L. Hupp for a settlement conference to be heard on August 11, 1998.

The Court, in order to allow the parties time to focus on their upcoming settlement conference, delayed taking any action on the parties' timely-filed Proposed Order until such time as it learned of that conference's outcome. When the Court learned that no settlement was reached, it turned its attention to the Proposed Order, and took no time at all in concluding both that said filing was wholly inadequate for its intended purpose of guiding the trial, and that, in all likelihood, valuable judicial resources had been wasted in having the dispute brought before a settlement officer. The parties had failed in their July 20 filing to stipulate or admit to any facts, even those regarding preliminary matters, and had done little more than restate what the Court already knew about the dispute. No effort was made to narrow the issues for trial, let alone to agree upon the issues such that the Court might be informed what the trial was going to be about, how long it was going to take, and how many witnesses would be necessary.

On August 17, 1998, the Court ordered the parties to

> **jointly** prepare and file, not later than August 21, 1998, a [Proposed Order] that **significantly** narrows the issues for trial [which was to] include a precise recital of the factual issues that both parties agree remain to be litigated.

August 17, 1998 Minute Order (emphasis in original).

The parties again timely filed an inadequate [Proposed] Revised Pre–Trial Conference Order ("Revised Order"). Although this Revised Order did contain eighty-one stipulated facts, there were still no admitted facts, and the parties chose to disregard the Court's explicit directions to jointly prepare and agree upon the disputed factual issues remaining to be tried, each instead filing as a separate exhibit its own Statement of Disputed Factual Issues. *See* Revised Order, August 21, 1998, Ex. C–1 and C–2. Because of the expedited nature of these proceedings, the Court was forced to go to trial without a signed Pre–Trial Conference Order.[2]

---

1. FED.R.CIV.P. 65(a)(2) provides, in relevant part:

   Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action

   on the merits to be advanced and consolidated with the hearing of the application.

2. During trial, the Court did adopt the list of eighty-one stipulated facts contained in the Re-

Without a proper Pre–Trial Conference Order, the Court found itself at a distinct disadvantage, as Plaintiff's theory of the case was never adequately delineated until after the start of the trial. The Court was forced to inquire of Plaintiff's counsel, before any testimony could be heard, just what theory Plaintiff was proceeding under, to which counsel indicated in open court that this was a reverse confusion case. This was the first time the Court was informed that Plaintiff was no longer proceeding under a forward confusion theory, and as a result exhibits were prepared, and evidence offered, which was not relevant to any material issue in the case as it came to be understood.

Although the parties agreed during the course of the trial to the admissibility of a large number of exhibits, these belated efforts at streamlining the proceedings were not nearly as effective as a properly prepared Pre–Trial Conference Order would have been. Unfortunately for all concerned, the pre-trial stage, during which the parties come to understand—often for the first time—what their case is about, did not occur until after the commencement of trial.

On August 27, 1998, at the end of the Plaintiff's case in chief, Mattel moved the Court to enter judgment as a matter of law pursuant to FED.R.CIV.P. 52(c), which provides, in relevant part:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law. . . .

The Court indicated on that date its intention to GRANT Mattel's Motion, and this Memorandum of Decision and Order shall serve as the Court's findings of fact and conclusions of law in support of its decision to enter judgment as a matter of law for Mattel.

## II. DEFENDANT'S BUSINESS

Since 1959, Mattel has produced and marketed, among other products, the famous Barbie line of dolls. Over the years, the Barbie line has expanded from a single doll to dolls featuring Barbie's friends and relatives, as well as lines of dolls and doll accessories that focus on a particular theme. One of the most popular theme lines is the annual "bathing suit" or "pool and beach" line, which have been around for at least the last ten years. Previous dolls in this segment have included "Glitter Beach Barbie," "Sparkle Beach Barbie," "Beach Fun Barbie," "Beach Blast Barbie," "Sun Jewel Barbie," "Tropical Barbie," "Tropical Splash Barbie," "Splash and Color Barbie," "Island Fun Barbie," "Sun Sensation Barbie," "Hawaiian Fun Barbie," "Sun Gold Malibu Barbie," and "Wet 'N Wild Barbie." The target market for the "bathing suit" line of Barbie dolls are girls aged three to ten.

Pearl Beach Barbie is the 1998 installment of Mattel's bathing suit line of Barbie dolls. The dolls feature pearl-accented swim wear and include a faux pearl ring (for the child) that changes color in warm water. All of the Pearl Beach Barbie line of dolls are sold in product packaging that employs the famous Barbie pink trade dress and displays the Barbie name and trademark, as well as the famous Mattel trademark and logo. Each Pearl Beach Barbie doll retails for approximately five dollars.

The development of the Pearl Beach Barbie line began in the spring of 1996, when Mattel's marketing department directed Cassidy Beal Park, the preliminary designer assigned to the project, to develop ideas for the 1998 line of bathing suit dolls. In mid–1996, Ms. Park developed three possible concepts, a pearl theme, a sea shell theme, and a jewel theme, and created a concept board for each. Ms. Park testified that she came up with the pearl theme because, after doing research in the marketplace, she believed that pearls were a popular trend among both children and young adults at that time. She gave the

vised Proposed Order, and incorporated said list    into the record.

pearl theme project the working title of Pearl Beach because of the natural association between pearls, the beach, and bathing suits. Ms. Park testified she had neither met nor heard of Plaintiff before this litigation began, nor seen any of her work.

Ms. Park's supervisors in the Preliminary Design Group chose the Pearl Beach concept for further development. Mattel's senior management gave "concept approval" to the doll in October 1996, and decided on the color change faux pearl ring as the "premium" to be included with the Pearl Beach Barbie line of dolls.

In the spring of 1997 Mattel requested that Margaret Hoebink, an in-house copywriter, as well as Ogilvy & Mather, Mattel's outside advertising agency, develop possible alternative names for the product. These prospective names were then submitted to Mattel's marketing department, which decided to retain the name Pearl Beach because it believed that its young target audience would easily remember and understand the name, and Pearl Beach would be the best "locator" for a child looking for a bathing suit Barbie with a pearl-accented bathing suit. Mattel ultimately selected the mark Pearl Beach because it believed that the mark reflects the product's characteristics and suggests a fanciful location.

In June 1997, before finalizing the name, Ms. Hoebink requested that a trademark search be conducted for "Pearl Beach," as well as variations of that name. Mattel engaged Thomson & Thomson, the leading trademark search firm, to conduct the trademark search. The trademark search revealed no individual or illustration business named Pearl Beach or Pearl Beach Graphics, or any other trademarks or conflicting uses of the name.

In mid–1997, the packaging for the product was developed under the direction of packaging designer Charlene Lowe. Ms. Lowe developed rough sketches for three distinct themes for the packaging—a thatched hut, a wave or tsunami, and a sea shell. Ms. Lowe then asked Mildred Quan, an in-house illus-

trator, to create more detailed drawings based on Ms. Lowe's sketches. Ms. Quan produced black and white drawings of Ms. Lowe's sketches in several hours. Those preliminary drawings were not used in the product packaging. Ms. Quan had met Plaintiff once, between five and ten years ago, while working on a freelance illustration project at a home in Los Angeles,[3] and had not seen her since. Ms. Quan was not aware that the drawings she was working on were for a Pearl Beach Barbie line until after this lawsuit was initiated.

Of the three potential packaging designs, Mattel's marketing department selected the sea shell design because they believed the sea shell best identified the product's key features. Ms. Lowe then commissioned an independent illustrator, Nora Koerber, to prepare drawings of shells for the packaging. Ms. Koerber and Ms. Lowe looked at several books with photographs of different varieties of shells, and Ms. Koerber provided Mattel with illustrations of six different shells. Mattel's marketing department chose Ms. Koerber's illustration of a radial sculpture clamshell because they believed it was simple, such that young girls would most readily identify it as a shell. Ms. Koerber had never heard of Plaintiff or seen any of her work.

Ms. Lowe then designed the Pearl Beach text logo on a wavy line to suggest the ocean, and selected a large, especially readable font. She then placed glittery accents and a sandy texture on the logo to further evoke the beach and pearl theme. Mattel launched the Pearl Beach Barbie line in December 1997, selling to large retail discount and toy stores such as Toys 'R' Us, Kay–Bee, K Mart, Target, and Wal–Mart. Barbie products are usually sold to the public in a special section or in an aisle devoted solely to Barbie products.

To promote the line, Mattel produced a television commercial which aired nationally during the spring of 1998. The commercial features a scene set at a beach, where young girls are playing with several dolls in the

---

**3.** Although Ms. Quan could not recall whose home it was, it seems clear that it was the home of Plaintiff and her husband, Steve Johnsen.

Pearl Beach Barbie line. One of the girls in the commercial explains "It's a beach Barbie." The product packaging of the Pearl Beach Barbie products is not displayed. The commercial also shows that a color change faux pearl ring is included with the Pearl Beach Barbie dolls.

The Pearl Beach Barbie line is a one-year product line planned to be sold from December 1997 through December 1998, primarily in the summer. The inventory of the Pearl Beach Barbie line now has been sold and no further dolls or accessories will be manufactured for this line. Mattel is well under way with the development of its 1999 version of the bathing suit Barbie doll line which will be released in December 1998.

### III. PLAINTIFF'S BUSINESS

Plaintiff, whose given name is Katherine Walter, adopted Pearl Beach as her personal and trade name around 1978, and has used same for the last 20 years.[4] Plaintiff chose to adopt the name Pearl Beach because it sounded like a romantic, exotic location. Plaintiff came up with the pearl and shell concept because pearls are naturally connected to shells. Plaintiff still uses the name Katherine Walter on credit cards, her tax returns, and other legal documents.

On or about March 19, 1979, Plaintiff filed a fictitious business name statement ("FBNS") with the Los Angeles County Clerk's Office stating that Plaintiff was doing business as "Pearl Beach." This FBNS expired in 1984, and Plaintiff never filed another FBNS for "Pearl Beach" until January 1998. Plaintiff has no federal or state trademark registration for "Pearl Beach" or any other trademark, trade name, or service mark.

As a commercial illustrator, Plaintiff is hired by companies or independent art directors working on behalf of companies to provide illustrations to be used in advertisements, promotional materials (such as brochures), and product packaging. Potential customers or clients contact Plaintiff's agents or, in some cases, deal with her directly. As is the practice in the commercial illustration industry, Plaintiff's name does not appear on the majority of products she has worked on that are sold to or seen by consumers. A notable exception to this rule is music packaging, such as album covers, which Plaintiff has worked on in the past.

Plaintiff has advertised in the WORKBOOK, which is distributed annually, free of charge to art directors and others nationally, nine times (in 1986, 1987, 1992, 1994, 1995, 1996, 1997, 1998, and 1999). Hundreds of other illustrators also appear in each of those publications. The cost for a one page ad in the WORKBOOK runs between $2500 and $3500. Artist's representatives, or agents, traditionally pay 25% of these advertising expenses in return for a 25% commission on all illustration services sold.

Plaintiff has used various cards containing the name "Pearl Beach" and an illustration of a pearl and shell. Until approximately 1984, Plaintiff used a "souvenir card" that she derived from antique postcards and added lettering that read "welcome to Pearl Beach." The last time Plaintiff remembers using that souvenir card was in the early 1990's as a birthday card for a friend. The "logo" that Plaintiff is using currently depicts a small, stylized, symmetrical shell with a large pearl in the center. As normally used by Plaintiff, this "logo" is monochromatic.

In or around 1994, Plaintiff's illustrations were used on note cards produced by Pearl Beach Graphics, an informal partnership between Plaintiff, her husband Steve Johnsen, and friend Marjorie Ornston. Pearl Beach Graphics filed a FBNS in 1994. Financial records of Pearl Beach Graphics show that from 1994 through 1995, its active period, Pearl Beach Graphics had gross revenues of no more than $7500 per year. Pearl Beach Graphics stopped activity in 1995. Plaintiff's former partner still has many of the cards produced by Pearl Beach Graphics at her home, which she either sells or gives away

---

4. Andrew Lubicz (pronounced Lou Beach), also an illustrator, shortened and anglicized his name one year after marrying Plaintiff in 1977, becoming known as Lou Beach. As Plaintiff's nickname had always been Pearl, she adopted the name Beach and became known thereafter as Pearl Beach.

when she gets the opportunity. There has not been a catalog for Pearl Beach Graphics since 1994. Plaintiff has approximately half of the 500 t-shirts which include images used in the Peal Beach Graphics cards in storage in her garage.

Plaintiff's commercial illustration services are marketed to sophisticated purchasers of commercial art, not children.

## IV. ANALYSIS

Plaintiff's first cause of action is for violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which provides, in relevant part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

> . . . .

> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Likelihood of confusion is the test for Plaintiff's claim for false designation under Lanham Act § 43(a) and her claims for common law and statutory unfair competition under California law.

> This Circuit has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act.

*Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir.1994).

■ The Lanham Act encompasses traditional trademark infringement ("forward confusion"), where a junior user of a trademark uses a mark that is so similar to the senior user's mark that the junior user's customers are confused into believing that they are buying the senior user's goods. Plaintiff no longer makes such a claim before this Court.

■ Plaintiff instead argues that this is a case about "reverse confusion," which `exists "when a trademark infringer so saturates the market with promotion of his trademark that consumers come to believe that the infringer, rather than the plaintiff, **is the source of** the trademarked product." *Murray v. Cable National Broadcasting Co.*, 86 F.3d 858, 861 (9th Cir.1996) (emphasis added). To the extent consumers have heard of the junior but not the senior user, they may consider the senior user the unauthorized infringer, thus damaging the senior user's reputation and goodwill. Even though "the owner's sales may benefit to some extent from the infringer's promotion of the mark . . . the reputation of the trademark owner's goods or services among prospective purchasers is no longer within the owner's exclusive control," thereby injuring the owner of the marks. RESTATEMENT (THIRD) OF UNFAIR COMPETITION (1995) § 20, comment (f).

The theory of reverse confusion Plaintiff puts forward is somewhat different:

> that by using the mark "Pearl Beach" in "Pearl Beach Barbie" with a pearl and shell logo, Plaintiff's customers are likely to be confused that Plaintiff PEARL BEACH, a commercial artist whose work includes product packaging, **is somehow associated with** the manufacturer of "Pearl Beach Barbie," Defendant Mattel, Inc.

Plaintiff's Trial Brief at 3 (emphasis added).

■ Unfortunately for Plaintiff, the courts of the Ninth Circuit have not recognized Plaintiff's proposed "somehow associated with" test in reverse confusion cases. *See Dreamwerks Production Group, Inc. v. SKG Studio, d/b/a Dreamworks SKG*, 142 F.3d 1127, 1130 (9th Cir.1998):

> ("The question in such cases is whether consumers doing business with the senior user might mistakenly believe that they are dealing with the junior user. More specifically, the question here is whether a reasonable consumer attending a Dream-

werks-sponsored convention might do so believing it is a convention **sponsored by** DreamWorks")
(emphasis added);

*Americana Trading Inc. (AMTRA) v. Russ Berrie & Co.,* 966 F.2d 1284, 1287 (9th Cir. 1992) ("that purchasers would believe that Russ **manufactured** Amtra's bears") (emphasis added). Although the Lanham Act does speak of confusion with respect to "affiliation, connection, or association," there is absolutely no support in the reverse confusion case law for Plaintiff's proposed "is somehow associated with" standard.

Furthermore, this reverse confusion case must focus not only on Plaintiff's customers, but on Plaintiff's goods and services as well. In other words, a potential consumer of Plaintiff's goods, while making a purchasing decision,[5] must believe that they are dealing with Mattel, i.e. that Mattel "sponsored," "is the source of," or "manufactured" those goods. Courts thus look at the degree to which the junior user, here Mattel, saturates the market with its infringing mark through promotional, marketing, and advertising activity to determine whether a reasonable consumer might mistakenly believe that the junior user is the **source** of the senior user's, i.e. Plaintiff's, goods.

▪ Plaintiff could easily show, and Mattel would not contest, that Barbie has become a household name, but the same cannot be said with respect to "Pearl Beach Barbie," and this is a crucial distinction. Plaintiff must show that Mattel's use of "Pearl Beach" in promoting its Pearl Beach Barbie line has made "Pearl Beach Barbie" so well known that when sophisticated commercial art purchasers encounter the Plaintiff's illustrations or illustration services in the marketplace, those customers mistakenly believe that Mattel is the source or sponsor of those illustrations or illustration services.

The uncontroverted evidence is that Mattel has aired only one commercial, aimed at Barbie's target audience of girls aged three to ten, which does not show the product packaging of which Plaintiff complains. If there is any confusion in this case, it occurs when Plaintiff's customers encounter Pearl Beach Barbie in a toy store, not when commercial art buyers encounter Plaintiff's work in the relevant marketplace. Although there have been collectible Barbie lines which prominently displayed the name of several world-renowned clothing designers (Bill Blass and Oscar de la Renta, to name a few), for sophisticated purchasers of commercial art to believe that Mattel would display Plaintiff's name so prominently, even if it had used her illustrations on the package, would not be reasonable. The Court is not convinced that the holder of such a belief could be considered "a reasonable consumer," and thus Plaintiff has not, indeed cannot, show the type of confusion she must to properly prove a likelihood of reverse confusion.

Regardless of Plaintiff's shortcomings in this regard, the Court will consider each of the relevant factors in support of its conclusion that no likelihood of confusion exists.

#### a. Likelihood of Confusion

The Ninth Circuit considers the following non-exclusive factors in deciding whether a likelihood of confusion exists:

1. strength of the mark;
2. proximity of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. type of goods and the degree of care likely to be exercised by the purchaser;
7. defendant's intent in selecting the mark; and
8. likelihood of expansion in the product lines.

*AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979).

The Ninth Circuit, in the *Dreamwerks* decision, focused on only three of the *Sleekcraft* factors: "(1) arbitrariness [strength] of the mark; (2) similarity of sight, sound and meaning; and (3) relatedness of the goods."

---

**5.** *See* Restatement (Third) of Unfair Competition (1995) § 20 reporter's note at 221 ("[T]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally.").

*Dreamwerks,* 142 F.3d at 1130. In addition to these three factors, the parties have addressed the factors of actual confusion and Mattel's intent. The Court will discuss all relevant *Sleekcraft* factors.

### 1. Strength of the Mark

■ "The strength of a mark is determined by its placement on a 'continuum of marks from 'generic,' afforded no protection; through 'descriptive' or 'suggestive,' given moderate protection; to 'arbitrary' or 'fanciful,' awarded maximum protection.'" *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1291 (9th Cir.1992) (citations omitted). The words "Pearl Beach" are not generic, and neither suggest nor describe any ingredient, quality, or characteristic of Plaintiff's illustration goods or services. Plaintiff chose to adopt the name Pearl Beach because it sounded like a romantic, exotic location, and thus, she argues, her mark is arbitrary and fanciful, and thus entitled to maximum protection.

Mattel counters that Plaintiff's mark "Pearl Beach" is her personal name, and thus a showing of secondary meaning is required. *See Gallo,* 967 F.2d at 1291 ("While personal names used as trademarks are not inherently distinctive, they are treated as strong marks upon a showing of secondary meaning. Secondary meaning is the consumer's association of the mark with a particular source or sponsor."). Mattel argues that Plaintiff has failed to establish that a *substantial* number of consumers associate her purported marks with Plaintiff. *See Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1354 (9th Cir.1985) (defining secondary meaning as "the mental association by **a substantial segment of consumers** and potential consumers 'between the alleged mark and a single source of the product' ") (citations omitted) (emphasis added).

Mattel makes much of the fact that Plaintiff's name, when it appears at all on her commercial artwork, is shown next to a copyright notice as the illustrator and not as a company. Thus, Mattel argues, it is used primarily as her personal, and not business name. Mattel ignores the fact that Plaintiff adopted this name for use in her business, in part to demonstrate her conceptual capabilities, and the ability to express them in a tangible form, something commercial art purchasers look for in an illustrator.

Plaintiff cites authority to the effect that "[t]he key is whether the public will likely perceive the term as a personal name, not whether the public knows 'the roster of corporate personnel.'" 2 MCCARTHY ON TRADEMARK AND UNFAIR COMPETITION, § 13:2 (4th ed.1998).

> Thus, in most instances the mark KING, although a common surname, will be understood in its ordinary lexicographic sense by consumers. In such cases, unless the mark otherwise describes the goods or services with which it is used, it will be considered an arbitrary or suggestive term eligible for protection as an inherently distinctive designation.

RESTATEMENT (THIRD) OF UNFAIR COMPETITION (1995) § 14 comment e at 129.

This language from the Restatement applies with equal force to both the words "Pearl" and "Beach," and thus no proof of secondary meaning should be required. Plaintiff's mark is strong.

### 2. Proximity (Relatedness) of the Goods

■ Plaintiff's illustration services and Mattel's line of dolls are completely unrelated. Proximity exists where the goods and services are (1) complementary, (2) sold to the same class of purchasers, or (3) are similar in use or function. *Sleekcraft,* 599 F.2d at 350. The products sold by the parties are not used or promoted together, and thus are not complementary. *See Gallo,* 967 F.2d at 1291. Nor are Plaintiff's goods and services sold to the same class of purchasers as Mattel's. The parties have stipulated that Plaintiff's customers are sophisticated purchasers of commercial art, while the target market for the bathing suit line of Barbie dolls, of which Pearl Beach Barbie is an example, are girls aged three to ten. Finally, the parties' goods and services are not similar in use or function.

Plaintiff argues that the conceptual nature of her goods and services are related to the conceptual nature of Mattel's goods. Plaintiff has demonstrated that part of the 'pack-

age' of commercial art goods and services that she produces is her conceptual capability and services. Plaintiff also argues that the themes and concepts communicated through Mattel's product packaging, produced through the creative efforts of commercial artists and illustrators, is an essential component of its doll products. Thus, Plaintiff concludes, it would be reasonable for any of Plaintiff's customers who are exposed to the Pearl Beach Barbie product packaging to believe that Plaintiff's commercial art and the product packaging that accompanies Mattel's dolls are related.

Besides improperly focusing on Plaintiff's customers with respect to Mattel's products, this argument has no logical stopping point; indeed the Court cannot conceive of any goods or services that are marketed or advertised through anything other than themes or concepts. Plaintiff's proposed test for relatedness would seem to allow any commercial artist or illustrator to claim their services were somehow 'related' to any products upon which such commercial art or illustrations appear. Plaintiff's argument distorts the test for relatedness beyond all reasonable bounds, and will not be adopted by this Court.

### 3. Similarity of the Marks

Similarity between marks "involves consideration of the marks and names in their entirety and as they appear in the marketplace." *Nutri/System, Inc. v. Con–Stan Industries, Inc.,* 809 F.2d 601, 605–06 (9th Cir. 1987) (citations omitted). Mattel's use of the words "Pearl Beach" always appears in conjunction with its own distinctive Mattel logo and trademark, and always appears in connection with Mattel's famous Barbie trademark. " [O]therwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer.' " *Pump, Inc. v. Collins Management, Inc.,* 746 F.Supp. 1159, 1168 (D.Mass.1990) (citations omitted); *see also W.W.W. Pharmaceutical Co. v. Gillette Co.,* 984 F.2d 567, 573 (2nd Cir.1993) (finding defendant's use of its well-known brand name "Right Guard" in conjunction with "sport stick" distinguished it from plaintiff's use of "sportstick").

■ The pearl and shell logo that Plaintiff currently uses is not similar in appearance to the packaging for Mattel's Pearl Beach Barbie products. Plaintiff's logo is stylized, symmetrical, and usually monochromatic, while the shell depicted in part of Mattel's packaging is of a different variety, is brightly colored in the distinctive Barbie pink, is asymmetrical and much larger than Plaintiff's purported logo.

### 4. Evidence of Actual Confusion

Plaintiff's evidence that a few acquaintances, friends, and family members thought that Plaintiff might be "in some way associated" with Mattel upon hearing of the Pearl Beach Barbie doll (usually when shown or told of the doll by Plaintiff) is not probative of a likelihood of confusion because " '[a]ttestations from person in close association and intimate contact with (the trademark claimant's) business do not reflect the views of the purchasing public.' " *Self–Realization Fellowship Church v. Ananda Church of Self–Realization,* 59 F.3d 902, 910 (9th Cir.1995) (citations omitted); *see also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION (1995) § 23, comment c ("Evidence of confusion arising in circumstances that differ from those in which the designations are encountered by prospective purchasers may be entitled to little weight.").

It is well established that "trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." RESTATEMENT (THIRD) OF UNFAIR COMPETITION (1995) § 20 reporter's note at 221; *see also International Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 826 (9th Cir.1993) ("The test for trademark infringement 'is the likelihood of confusion of ordinary purchasers purchasing in the ordinary manner.' ") (citation omitted).

Plaintiff and her representative admit that they are not aware of anyone who thought that Plaintiff's illustration services were produced, sponsored, or approved by Mattel.

### 5. Marketing Channels Used

Advertising, as well as retail distribution, is considered in addressing this factor. *Nu-*

*tri/System,* 809 F.2d at 606. In this case, the marketing channels are widely divergent.

With regard to Plaintiff's illustration services, the commercial art buyers who are her potential customers contact Plaintiff's agent, or in some cases deal with her directly. With regard to the greeting cards offered through Pearl Beach Graphics, Plaintiff has not shown that those products are currently for sale and, in any case, Plaintiff is not aware of any store where those cards are offered for sale that also sells Barbie products.

Mattel, on the other hand, sells the majority of its dolls and doll accessories to large toy and discount stores such as Toys 'R' Us, Wal–Mart, K–Mart, and Target, often in a separate section in these stores devoted solely to Barbie products.

The advertising each party does is equally dissimilar. Plaintiff has done limited advertising in trade journals, and sometimes sends copies of those ads to art directors and other professional, sophisticated buyers. Mattel advertises on TV and in magazines, targeting young females.

### 6. *Type of Goods and the Degree of Care Likely to be Exercised by the Purchaser*

Because Plaintiff's illustration services usually costs hundreds or thousands of dollars and are purchased by sophisticated commercial art buyers as part of their job responsibilities, purchasers of her services are likely to take greater care in selecting her services. *See* 2 MCCARTHY ON TRADEMARK AND UNFAIR COMPETITION, § 23:101 (4th ed.1998)

> Where the relevant buyer class is composed solely of professional, or commercial purchasers, it is reasonable to set a higher standard of care than exists for consumers.... [I]t is assumed that such professional buyers are less likely to be confused than the ordinary consumer.

### 7. *Defendant's Intent in Selecting the Mark*

The testimony of Mattel employees responsible for the conception and development of the Pearl Beach Barbie line shows that none of those employees was aware of Plaintiff's existence or work at the time of development. The Mattel product's name and shell-design packaging were conceived independently, based on pragmatic marketing concerns and from the natural association of beaches, shells, and pearls. The name Pearl Beach is consistent with other names previously used by Mattel in their bathing suit line of Barbie dolls.

The trademark search commissioned by Mattel revealed no trademark or dba listing for Plaintiff, nor any conflicting use found for dolls or toys. Thus Mattel acted in an entirely reasonable manner in selecting the Pearl Beach name. Even under the negligence analysis that Plaintiff argues applies in reverse confusion cases, Mattel has acted reasonably. *See Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 480 (3d Cir.1994) ("The intent inquiry appropriate ... [is] whether Vigoro conducted an adequate name search for other companies marketing similar goods under trademarks including the name 'Fairway,' and whether it followed through with its investigation when it found there were such companies.") The internal investigation Plaintiff suggests would have revealed the existence of Pearl Beach does not at all seem a reasonable requirement to impose on Mattel, given the fact they selected the name Pearl Beach to suggest a fantasy place, and did not think of it as a personal name.

The evidence that Plaintiff offered of her alleged past interaction with Mattel, i.e. that Mattel had hired Plaintiff in the mid–1980s to do design work for a "Sweet Sea" mermaid doll, was entirely rebutted by Mattel's proof that Tomy Corporation, another toy manufacturer, and not Mattel, marketed that doll in the mid–1980s. It would be piling inference upon inference to suggest that Plaintiff's advertising in the WORKBOOK, which employees at Mattel used, and even any direct mail advertising she may have sent to Mattel, somehow put the company on notice as to Plaintiff's existence. Even Nora Koerber, who designed the shell ultimately used on the Pearl Beach Barbie packaging, an independent illustrator who herself advertised in the WORKBOOK, had never heard of Plaintiff.

The testimony of Nancy Blair Griffin, who had worked for Mattel and had worked prior to that with Plaintiff, does nothing to tip the balance in Plaintiff's favor with respect to the intent factor. Ms. Griffin merely testified that she had requested "leave behinds" or samples of Plaintiff's artwork in the early 1990s in connection with a "Garden" or "Rose Bride" Barbie doll Mattel was developing. Plaintiff was never hired to do any illustrations. After Ms. Griffin was laid off by Mattel in 1995, she was employed by Disney as an independent contractor, and again requested leave behinds in connection with a series of Barbie picture books Disney, in conjunction with Mattel, was considering. Again, Plaintiff did no work on ·the project. This can hardly be considered evidence of 'corporate knowledge' or notice so as to create a duty for Mattel to investigate further.

### 8. Likelihood of Expansion in the Product Lines

Plaintiff has no plans to expand her product lines to include dolls or even toys. Mattel has no plans to expand its product lines to include offering commercial illustration services to other companies.

### V. CONCLUSION

Because Plaintiff has failed to demonstrate a likelihood of reverse confusion, as defined in this Circuit, and because the only *Sleekcraft* factor that arguably weighs in Plaintiff's favor is the strength of her mark, the Court hereby GRANTS Mattel's Motion for Judgment on Partial Findings Upon Close of Plaintiff's Case, pursuant to FED.R.CIV.P. 52(c).

IT IS SO ORDERED.