M2 SOFTWARE, INC., a Delaware
corporation, Plaintiff,

v.

VIACOM, INC., a Delaware corporation;
Viacom International, Inc., a Delaware corporation; and MTV Networks
Company, a Delaware corporation,
Defendants.

No. CV 98–8734 RAP MCX.

United States District Court,
C.D. California.

July 27, 2000.

Robert B Owens, Owens & Gach Ray, Los Angeles, CA, Mark L Johnson, Steven L Baron, D'Ancona & Pflaum, Chicago, IL, Don A Hernandez, Don A Hernandez Law Offices, Pasadena, CA, E Randol Schoenberg, E Randol Schoenberg Law Offices, Los Angeles, CA, for plaintiff.

Anthony M Keats, Dennis L Wilson, Larry W McFarland, Keats McFarland & Wilson, Beverly Hills, CA, for defendants.

## ORDER GRANTING SUMMARY JUDGMENT

PAEZ, District Judge.

## I.

### Introduction

Plaintiff M2 Software, Inc. brings this action for damages against defendants Viacom, Inc., Viacom International, Inc. and MTV Networks Company for trademark infringement and unfair competition. Plaintiff owns the federally registered trademark for the M2 mark. Plaintiff asserts that defendants unlawfully infringed the M2 mark when they used it to describe their second cable network, M2: Music Television. As a result, plaintiff filed its complaint against defendants on October 28, 1998, alleging seven federal and state causes of action, including trademark infringement, unfair competition, trademark dilution and unfair business practice.

Plaintiff previously moved for a preliminary injunction barring defendants' use of the M2 mark in conjunction with the M2: Music Television channel or any other product. The Court denied the motion, finding that, although plaintiff had shown a likelihood of success on the merits, it had not shown a possibility of irreparable harm because the plaintiff had delayed in bringing the motion and the evidence did not show the imminent expansion of defendant's business. *See M2 Software, Inc. v. Viacom Inc. et al.,* No. CV 98–8743 RAP (MCX) (C.D. Cal. filed January 27, 1999) ("Preliminary Injunction Order").

Following the denial of the preliminary injunction, defendants changed the logo of their new programming service from "M2: Music Television" to "MTV 2."

Pending before the Court is defendants' motion for summary judgment. Defendants argue that plaintiff's 1st, 2nd, 4th, 6th, and 7th causes of action [1], which en-

---

**1.** These causes of action are for: federal statutory trademark infringement (15 U.S.C. § 1114, et seq.), trademark infringement and false designation of origin (15 U.S.C. § 1125), common law trademark infringement, common law passing off and unfair competition, and state statutory unfair trade practice (Cal. Bus. Prof.Code § 17200, et. seq.). Because each of these claims is based on the alleged infringement of plaintiff's trademark, these claims will be analyzed together in the Trademark Infringement section of this order.

compass defendants' alleged infringement of plaintiff's trademark, should be dismissed because four of plaintiff's five products were never "used in commerce" so as to invoke trademark protection and defendants did not infringe the trademark of the one protected product. Defendants argue that plaintiff's 3rd and 5th causes of action for federal and state dilution, under 15 U.S.C. § 1125(c) and Cal. Bus. Prof.Code § 14330, should be dismissed because plaintiff's mark is not famous. Defendants also argue that plaintiff sustained no damage from defendants' conduct.

## II.

### Factual Background

M2 Software, a Delaware corporation based in Los Angeles, owns the federally registered trademark "M2." The corporation is a one-man operation, run entirely by Dave Escamilla, a musician and a graduate of Stanford College and Wharton School of Business. Escamilla began doing business as M2 Software in Fall 1991.

His original product was the M2 Multimedia Sampler, later called M2 BPC interactive. This was a program that allowed a viewer to hear clips of music and watch animation and video footage. The product was available on floppy disc and cassette tape, and it was downloadable as "shareware," whereby a consumer could download the program via an on-line service and later pay for the program if he chose to keep it. M2 Software offers no proof of any sales of this product. Plaintiff admits that this product was not commercially available after 1995.

In 1991, M2 Software began marketing its Record Label Management System ("RLMS"), a software system for use by record companies in managing royalties and other information related to their music and video products. Between 1992 and 1997, plaintiff licensed RLMS systems to

thirteen recording companies. It modified the system in 1993 or 1994 by adding a feature that let users link to clips of music and videos. Defendants claim that this feature is not mentioned in any brochures for the product, and that none of the thirteen licensees' systems have music or video content. Plaintiff claims this feature provides music and video functionality—not content—and that this capability is installed at client sites. Plaintiff does not advertise the RLMS system.

Plaintiff's trademark registration issued on October 31, 1995, based upon plaintiff's first use in October of 1991. The trademark issued for use on "computer software featuring business management applications for the film and music industries; and interactive multimedia applications for entertainment, education and information, in the nature of artists' performances and biographical information from the film and music industries; and instructions and information for playing musical instruments."

In 1997, plaintiff created an interactive video CD–ROM under the M2 label featuring the group Marden Hill for Stepping Stone Recordings. Stepping Stone sent promotional copies of the product to retail record stores. The CD was listed in an ad in Spin Magazine for a Marden Hill album.

In late 1998, plaintiff produced a CD–ROM under the M2 label featuring a performer called Buckethead. The CD was given away or sold as a promotion by Buckethead at concerts, through mail order, and on the Buckethead website. In March 1998, plaintiff placed an ad in Guitar Magazine promoting an instructional video by Buckethead and the CD. In 1999, plaintiff began distributing the CD through Amazon.com.[2]

Defendants are all Delaware corporations involved in the entertainment indus-

---

**2.** Plaintiff originally alleged in its complaint that it also produced a fifth product—the M2 Music Service. Defendants contend that this product is merely a list of domain name registrations, and one of those listed, M2MU-

SIC.COM is not an active web site. Plaintiff does not mention this product in its opposing memorandum, and the Court does not consider this product in this infringement inquiry.

try, encompassing the music, television, recording and multimedia fields. In particular, MTV Networks operates two music channels broadcasting primarily through cable and satellite providers. In August 1996, MTV Networks launched its second cable network, called M2: Music Television. The M2: Music Television network was initially available only to subscribers with C-band satellite dishes, large satellite dishes typically utilized in rural areas. Only three million viewers originally had access to the channel, and Los Angeles and Manhattan were "blacked out" from viewing the channel. Today, the M2: Music Television channel maintains a subscriber base of eleven million consumers. Defendants have never sold advertising on M2: Music Television and they have provided the programming to cable and satellite operators for no charge.

Around the time defendants launched M2: Music Television, defendants entered into an agreement with Intel which enabled defendants to provide additional programming elements that could be accessed through Intel's Intercast technology. These elements were part of the analog feed that supplied the programming—not part of the internet. Thus, to access this technology, a consumer had to receive an analog feed of M2: Music Television. Further, the consumer needed to purchase Intel's Intercast TV tuner card. Intel's Intercast technology was a commercial failure and has been phased out. Only three or four people ever viewed the Intercast additional programming elements for M2: Music Television.

## III.

### Discussion

#### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a fact is material is determined by looking to the governing substantive law; if the fact may affect the outcome, it is material. *Id.* at 248, 106 S.Ct. 2505. If the moving party seeks summary adjudication with respect to a claim or defense upon which it bears the burden of proof at trial, its burden must be satisfied by affirmative, admissible evidence. By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence submitted by the non-moving party. The moving party need not disprove the other party's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In assessing whether the non-moving party has raised a genuine issue, its evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, *citing Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Nonetheless, "the mere existence of a scintilla of evidence" is insufficient to create a genuine issue of material fact. *Id.* at 252, 106 S.Ct. 2505. As the Supreme Court explained in *Matsushita,*

> [w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

*Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87, 106 S.Ct. 1348.

To be admissible for purposes of summary judgment, declarations or affidavits must be based on personal knowledge, must set forth "such facts as would be admissible in evidence," and must show that the declarant or affiant is competent to testify concerning the facts at issue. Fed.R.Civ.P. 56(e). Declarations on information and belief are insufficient to establish a factual dispute for purposes of summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989).

Summary judgment is not treated as "a disfavored procedural shortcut" but as "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548, *quoting* Fed.R.Civ.P. 1.

### B. Trademark Infringement

"A trademark is a limited property right in a particular word, phrase or symbol." *New Kids On The Block v. News America Publishing, Inc.*, 971 F.2d 302, 306 (9th Cir.1992). "In a trademark infringement claim, the plaintiff must demonstrate: (1) the validity of its trademark; and (2) the infringement of that mark." *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 726 (7th Cir.1998).

#### 1. Prior Commercial use of the M2 Trademark

Plaintiff can only succeed on its trademark claims if its trademark M2 is entitled to protection. As proof of its validity, plaintiff points to the federal registration of the trademark. Plaintiff also argues that it has used the trademark in commerce since 1991.

■ A federal trademark registration is prima facie evidence of the registrant's ownership of the mark and provides a presumption of validity. *See Sengoku Works Ltd. v. RMC International, Ltd.*, 96 F.3d 1217 (9th Cir.1996). However, "[o]wnership rights flow only from prior use, either constructive or actual." J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition § 16:18 (1999). Thus, federal registration provides the holder with a presumption of ownership—but not actual ownership. Actual ownership derives from prior use. *Id.*

■ A trademark is used by attaching it to a product and placing it in the flow of commerce. Therefore, a necessary corollary of the prior use rule is that a trademark is only entitled to protection once it is attached to a specific product. Thus, a registered trademark holder does not own a mark merely when he knows the type of products he hopes to market or intends to market a certain product. *See Societe de Developments et D'Innovations des Marches Agricoles v. International Yogurt Co.*, 662 F.Supp. 839, 852 (D.Or.1987). Exclusive rights to a mark are secured when a product bearing the mark is placed in the marketplace, or, under language of the Lanham Act, is "used in commerce." *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir.1992). This rule is designed to protect other potential market entrants by providing notice of the existence of a mark and its association with a product before substantial sums are invested in promotion. *Id.* Accordingly, trademark ownership is analyzed in connection with a given product at the time it is "used in commerce," not at the time its owner first acquired rights in the mark through its use on prior products. Ownership of a mark does not grant protection ad infinitum for any product its owner may at some point choose to adorn with the mark. This idea is buttressed by case law allowing a party to use a pre-existing mark on a different product in a different market from that of the original user. *See McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126 (2d Cir.1979) (allowing man-

ufacturer of expensive women's coat to use trademark "Drizzle," despite prior registration of "Drizzler" mark for plaintiff's cheaper golf jackets); *King Research, Inc. v. Shulton, Inc.*, 454 F.2d 66 (2d Cir.1972) (finding "Ship Shape" on hairspray did not infringe registered "Ship Shape" trademark for comb and brush cleaners).

Given the foregoing rules, whether plaintiff's trademark is entitled to protection must be analyzed as to each product bearing the M2 mark by considering the date that each was placed in commerce. Plaintiff's M2 Multimedia Sampler was used in commerce from 1991 to 1995. Plaintiff's RLMS system has been used in commerce from 1991 to the present. Plaintiff's Marden Hill CD was placed in commerce in 1997, and plaintiff's Buckethead CD was placed in commerce in 1998. Defendants' M2: Music Television programming was used in commerce with the M2 mark from 1996 to 1999. A simple analysis of this timeline reveals that plaintiff's ownership of the M2 trademark, at the time defendants entered the market, was only enforceable in connection with its RLMS system because RLMS was the only product commercially available at the time M2: Music Television entered the market. The M2 Multimedia Sampler was no longer used in commerce, and the two CD's had not yet been used in commerce. Defendants had no notice of the association of the trademark M2 with these three products when it entered the market with the M2: Music Television mark. The association of M2 with RLMS, a narrowly focused accounting system, was insufficient to give defendants notice of this association, and, therefore, use of the M2 mark with RLMS does not validate plaintiff's use of the mark with earlier or later products. Because the trademark M2 was "used in commerce" by plaintiff only in connection with RLMS at the time defendants entered the market, plaintiff can

only succeed on its infringement claim with reference to this product.[3]

## 2. Infringement of M2's Trademark

### a. The Allegedly Infringing Conduct

Before an infringement claim can be resolved, the products involved and the allegedly infringing conduct must be delineated. As described above, plaintiff's trademark could only have been infringed by defendants with respect to its RLMS product. The RLMS is a software system which allows recording companies to keep track of their royalties. Consumers of the product license the system from plaintiff. Escamilla personally installs the system and, as part of the license, provides upkeep on the system for one year. Plaintiff has licensed the system to thirteen companies. Thus, each consumer seeks and receives a personalized product.

Plaintiff claims the system has video and audio capabilities, whereby licensees can install video and audio content relating to their clients. Defendants claim that this capability is not mentioned in the RLMS brochure and that not one of the thirteen licensees have used this capability. Defendants provide deposition testimony from a number of the licensees which backs up this assertion. Plaintiff provides testimony from two licensees which suggest their systems may have such capabilities but that the capabilities have never been used by either licensee. *See* Plaintiff's Exs. 14:911–13, 24:1601–04. Because the facts must be viewed in the light most favorable to the plaintiff on this motion for summary judgment, the Court assumes the product features this capability.

Defendants entered the market in 1996 with a music video programming service bearing the mark M2. Defendants provide the service to satellite and cable providers who then transmit the service to television

---

**3.** Defendants argue that infringement should be judged only as to the RLMS system because plaintiff's other products never have been used in commerce. The Court does not consider this argument because it is clear that, at the time defendants entered the market with the M2: Music Television mark, plaintiff's other products either were no longer or had not yet been used in commerce.

viewers around the country. It seems clear that, when the service was introduced, defendants intended the service to be compatible with computers such that viewers could access the service through their computers. The Intel agreement highlights this intent. However, the evidence clearly shows that this capability did not materialize. Intel no longer offers the technology which provided access to defendants' programming, and neither party alleges that M2: Music Television could be accessed by computer in any other way. Only three or four people ever accessed defendants' programming via computer.

 Trademark infringement actions do not turn on the alleged appropriation of the trademark. *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1403 (9th Cir.1997). Instead, they turn on whether the junior mark causes a likelihood of confusion in the marketplace. *Id.* This matter presents the unusual situation of reverse confusion. Reverse confusion occurs when consumers do business with the senior user under the mistaken impression it is the junior user. *Dreamwerks Production Group, Inc. v. SKG Studio,* 142 F.3d 1127, 1129 (9th Cir.1998). Claims of trademark infringement and reverse confusion rely on the same test—likelihood of confusion. *See generally id.*

 The test for determining the likelihood of confusion "is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Id.* at 1129. The Ninth Circuit looks to eight specific factors when evaluating the likelihood of confusion:

(1) the strength of the plaintiff's mark;
(2) relatedness of the goods;
(3) similarity of the marks;
(4) evidence of actual confusion;
(5) marketing channels;
(6) type of goods and purchaser care;
(7) intent; and
(8) likelihood of expansion.

*Id. citing AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979). The

*Sleekcraft* factors are not exhaustive. *Sleekcraft,* 599 F.2d at 348 n. 11. In fact, "[o]ther variables may come into play depending on the particular facts presented". *Id.* In a reverse confusion case, the Ninth Circuit focuses on three particular factors: strength of the mark, similarity of the marks, and relatedness of the goods. *Dreamwerks,* 142 F.3d at 1130 ("Three of the Sleekcraft factors are pivotal here.").

### b. The Sleekcraft Factors

### i. Strength of Mark

The Court found in its prior ruling that the M2 mark is an arbitrary and fanciful mark, and therefore deserving of broad trademark protection. *See* Preliminary Injunction Order at 7–8, *citing Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215 (9th Cir.1987); *National Customer Engineering Inc. v. Lockheed Martin Corp.,* 43 U.S.P.Q.2d 1036, 1038 (C.D.Cal. 1997). This conclusion remains unchanged.

### ii. Relatedness of the Goods

 In determining the relatedness of the products or services, the Court may consider whether the goods are: (1) complementary; (2) similar in use or function; or (3) sold to the same class of purchasers. *Sleekcraft,* 599 F.2d at 350.

Plaintiff argues that the two products are complementary. Without specifically explaining how the products complement each other, plaintiff vigorously asserts that defendants intended their programming to be computer-ready. Needless to say, defendants may have intended their product to offer numerous features and capabilities which never made it to the marketplace. The ability to access and otherwise use the M2: Music Television programming with a computer appears to be one such feature. The evidence shows that the programming was not computer-ready, having been accessed via computer by only three or four people.

Though plaintiff does not argue this, RLMS's video capability suggests that the products could be complementary. RLMS users can input video content into the system; M2: Music Television contains video programming. Presumably, if all had proceeded according to defendants' plan, a viewer could download a video from M2: Music Television for input into the RLMS system. However, because M2: Music Television is not computer-ready, a user cannot take a video directly from M2: Music Television and copy it to a computer. As for compatibility with RLMS's main function of tracking royalties, plaintiff does not allege that recording companies are owed royalties when a client's video plays on M2: Music Television. Plaintiff simply cannot show complementary functions between the two products, and no reasonable trier of fact could conclude otherwise.

The products are not similar in use or function. RLMS is a computer software program for calculating royalties which allows users to input music and videos into the system. M2: Music Television is television programming, whose content is music videos. They both involve music and videos but in quite different ways. One is an accounting and informational product, one is an entertainment programming product. Again, each potentially involves music and video, so the products relate to the same basic industry, but they are not "similar in use or function."

The third arm of the "relatedness" critique asks whether the goods are sold to the same class of purchasers. Plaintiffs contend that both parties "interact" with record companies. This may be true, but interaction does not equal consumption. Defendants argue that plaintiff's consumers differ from defendants' consumers. Defendants' consumers are cable and satellite providers while plaintiff's purchasers are record industry executives. As executives, they represent sophisticated consumers capable of discerning a difference between the products and their manufacturers.

The *Dreamwerks* case is instructive. It points out that the focus should rest on the consumers and whether they are likely to associate plaintiff's products with defendants. *Id.* It seems unlikely that plaintiff's consumers, record executives, could be confused as to whether MTV also markets the RLMS product. Escamilla personally markets and installs the system, and no evidence shows that any customer has thought Escamilla was allied with the defendants.

Thus, the goods do not complement each other, they do not have a similar use or function, and they are not sold to the same class of purchasers. According to the test, the goods do not "relate" to each other. The fact that both may relate to music and videos does not affect this outcome.

### iii. Similarity of the Marks

The Court found in its prior ruling that the marks used by each party were identical under the "sight, sound and meaning" test. *See* Preliminary Injunction Order at 11–12, *citing Dreamwerks,* 142 F.3d at 1131. This finding remains unchanged.

### iv. Actual Confusion

Defendants properly point out that plaintiff has failed to submit survey evidence or any proof that "an appreciable number of reasonably prudent purchasers exercising ordinary care" have been confused as to the source of plaintiff's product. *Lord Simon Cairns v. Franklin Mint Co.,* 24 F.Supp.2d 1013, 1042 (C.D.Cal.1998). In fact, plaintiff does not show proof that even one purchaser or potential purchaser of RLMS has been confused. Plaintiff points to one incident of alleged reverse confusion in which a record executive "question[ed] the credibility of M2 Software." Plaintiff's Opposition, 17:11. In response, defendants cite to a First Circuit case which held that trademark law did not provide relief for "falsely being thought a pirate." *DeCosta v. Viacom Int'l, Inc.,* 981 F.2d 602, 610 (1st Cir.1992). Plaintiff does not allege that

the consumer questioned whether defendants or plaintiff were the source of the RLMS product, only whether plaintiff was wrongly using defendants' trademark. Thus, the alleged incident does not present an actual case of reverse confusion.

It is true that the absence of actual confusion is not dispositive. *Rodeo Collection*, 812 F.2d at 1219 ("The lack of evidence of actual confusion is not controlling."); *see also E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir.1992); *Eclipse Assocs. Limited v. Data General Corp.*, 894 F.2d 1114, 1118 (9th Cir.1990). Still, the fact that plaintiff cannot point to one actual or potential RLMS consumer who confused the source of the product is telling.

### v. Marketing Channels

"Advertising, as well as retail distribution, is considered in addressing this factor." *Walter v. Mattel*, 31 F.Supp.2d 751, 760–61 (C.D.Cal.1998) *citing Nutri/System, Inc. v. Con–Stan Industries, Inc.*, 809 F.2d 601, 606 (9th Cir.1987).

Plaintiff describes a number of its advertising channels, most of which seem to pertain to its CD–ROM products. None of the advertising specifically promotes RLMS. RLMS is mainly promoted via word of mouth. However, RLMS may benefit from small ads that plaintiff has taken out in the back of music magazines, which merely include the name "M2 Software." Defendants do not describe their methods of advertising M2: Music Television. Plaintiff argues, however, that the programming service has been advertised over the air, on-line, at trade shows, at promotional events, at live concerts, in retail music stores, and through press releases. Although the parties do not advertise their products in similar ways, both rely on music magazines.

As noted above, plaintiff's RLMS product is distributed to record companies, whereas defendants' product is distributed to cable and satellite providers. However, plaintiff's argument that both parties "interface" with record companies is relevant

to this factor. Plaintiff shows that defendants have had contact with BMG Entertainment and Warner Brothers, two of plaintiff's customers, which supports the argument that they share "convergent marketing channels." *Nutri/System, Inc.*, 809 F.2d at 606. Clearly, both companies conduct business in the music industry. Given that plaintiff mainly promotes RLMS via word of mouth, it is important that all of the people Escamilla comes into contact with are aware of defendants and that some of them probably have indirect business contact with defendants. This element weighs in plaintiff's favor.

### vi. Type of Goods and Consumer Care in Purchasing

The parties' products are not the same type of goods: one is a software system, while the other is music video television programming. Furthermore, RLMS customers use much care in selecting the product because RLMS cannot be purchased off the shelf. The consumer must meet with Escamilla, license the product, and have the product installed by Escamilla on-site. This evinces a high degree of consumer care in purchasing.

### vii. Defendants' Intent

Plaintiff offers two arguments in favor of bad faith. First, defendants had notice of plaintiff's trademark but chose to use the mark anyway. Defendants do not deny that their counsel conducted a due diligence search of registered trademarks before adopting the M2 mark. They assert that their decision to go forward with the M2 mark suggests that they believed the products were different enough for them to proceed without committing infringement. Furthermore, they cite McCarthy for the argument that a junior user's actual or constructive notice of a senior user's mark does not necessarily show bad faith. 3 McCarthy § 23:109.

Second, plaintiff cites McCarthy for the proposition that a defendant's prior infringing conduct can be considered in a

bad faith determination. It points out that defendants were enjoined from infringing a small Chicago retailer's TV Land trademark in the case *TV Land v. Viacom Int'l, Inc.*, 908 F.Supp. 543 (N.D.Ill.1995). Defendants do not rebut this argument.

Defendants point out that the ultimate goal of this factor is to test whether the junior user intended to "palm off" its product as the product of the senior user. *GTE Corp. v. Williams*, 904 F.2d 536, 542 (10th Cir.1990). Indeed, the Ninth Circuit has noted that intent to deceive is not relevant in reverse confusion cases. *Dreamwerks*, 142 F.3d at 1130. This is so because a junior user in reverse confusion cases is larger and better known than the senior user and therefore is not attempting to palm off its products as the senior user's. This argument applies here. Given this argument's logic, and plaintiff's lack of proof of bad faith, this element weighs in defendants' favor.

### viii. Likelihood of Expansion

This element weighs in defendants' favor, and indeed may be considered moot, because defendants have stopped using the M2 mark for its programming service. Even if defendants choose to expand the market for this product, it will not affect plaintiff's mark.

### c. Application

Five of the eight Sleekcraft factors weigh in defendants' favor: the goods are not technically related; there is no evidence of actual confusion; there is a high degree of purchaser care; there is no evidence of bad faith; and there is no likelihood of expansion. Three Sleekcraft factors weigh in plaintiff's favor: the M2 trademark is strong; the parties's marks are extremely similar; and the marketing channels may be related.

The *Dreamwerks* court found that "[t]hree of the Sleekcraft factors are pivotal" in reverse confusion cases: strength of the mark, similarity of the mark, and relatedness of the goods. *Dreamwerks*, 142 F.3d at 1130. The first two factors weigh strongly in plaintiff's favor. The M2 trademark is strong because it is an arbitrary mark and it is identical to the mark placed in commerce by defendants. The third factor weighs in defendants' favor because the two products are not related: they are not complementary, they do not have similar functions, and they do not have the same distribution scheme. The *Dreamwerks* court noted that "the factors should not be rigidly weighed; we do not count beans. Rather, the factors are intended to guide the court in assessing the basic question of likelihood of confusion." *Dreamwerks*, 142 F.3d at 1129 (quotations omitted), *quoting E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir.1992).

Looking at the big picture, the Court finds that likelihood of confusion does not exist and that no reasonable trier of fact could conclude otherwise. The parties' products were extremely different at the time defendant entered the market, and there has been no actual confusion as to the source of RLMS. Mr. Escamilla may have every intention of using the M2 mark in connection with the production and marketing of musical, interactive CD–ROM's. Unfortunately, his intentions do not grant him automatic trademark protection in such products. Review of the Sleekcraft factors reflects the picture painted by the admissible evidence: plaintiff had not yet produced any such products at the time defendants entered the market. It may seem unfair that a company with a large presence in a market that Escamilla hoped to enter could gain rights to his existing mark before he had a chance to enter the market. However, trademark law protects the prior user, and the undisputed evidence shows that plaintiff had not yet entered the musical CD–ROM market with any of his products at the time defendants began to use the M2: Music Television mark. What plaintiff did market was an accounting software system, which Escamilla personally installed for thirteen recording companies. This system may have had a music/video component, but it is clear

that RLMS's consumers did not purchase the system for this feature and indeed may have never even used the component. The undisputed admissible evidence shows that plaintiff's RLMS product was quite different from that offered by defendants. It was promoted differently and it was purchased by sophisticated record company executives. Defendants were not seeking to misappropriate plaintiff's goodwill, and the threat from defendants' use of the mark, to the extent there was any, is now nonexistent. Plaintiff is now free to enter defendants' market with the M2 mark because defendants have changed their mark.

Defendants did not infringe plaintiff's M2 mark when they entered the market with M2: Music Television in 1996. There was no likelihood of confusion between the marks, and no reasonable jury could conclude otherwise. Defendants are entitled to summary judgment on plaintiff's trademark infringement claims.

## C. Dilution

Defendants also move to dismiss plaintiff's third and fifth claims for relief for trademark dilution under the Federal Trademark Dilution Act, 15 U.S.C. § 1125, and California's trademark dilution statute, Cal. Bus. Prof.Code § 14330. Plaintiff premises its claim for damages by dilution[4] on 15 U.S.C. § 1125(c), which provides that

the owner of a famous mark shall be entitled, subject to principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become

famous and causes dilution of the distinctive quality of the mark[.]

15 U.S.C. S 1125(c)(1). Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." 15 U.S.C. § 1127; *see also Panavision Int'l L.P. v. Toeppen*, 945 F.Supp. 1296, 1301 (C.D.Cal.1996) ("Trademark dilution laws protect 'distinctive' or 'famous' trademarks from certain unauthorized uses of the marks regardless of a showing of competition or likelihood of confusion."), *aff'd, Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir.1998).[5] To prove a violation of the Federal Trademark Dilution Act, a plaintiff must show that (1) the mark is famous; (2) the defendant is making a commercial use of the mark; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services. *Panavision*, 141 F.3d at 1324.

The Federal Trademark Dilution Act lists eight non-exclusive factors a court may consider in determining whether a mark is distinctive and famous. The statutory factors are:

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

---

4. The California dilution statute provides for injunctive relief, but does not authorize damages. Therefore, to the extent plaintiff sought injunctive relief under the California statute, its claim is moot because defendants no longer utilize the M2 mark.

5. Traditionally, dilution has been found where the defendant's conduct either tarnishes or blurs the mark, but dilution is not limited to tarnishment and blurring. *Panavision Int'l,*

141 F.3d at 1326. When a famous mark is linked to products of lesser quality or portrayed in an unwholesome manner, the mark is tarnished. *Panavision Int'l*, 945 F.Supp. at 1304 (citations omitted). " 'Blurring' involves a 'whittling away' of the selling power and value of a trademark by unauthorized use of the mark. Examples of blurring would be 'Pepsi' in-line skates or 'Microsoft' lipstick." *Id.*

(D) the geographical extent of the trading area in which the mark is used;
(E) the channels of trade for the goods or services with which the mark is used;
(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;
(G) the nature and extent of use of the same or similar marks by third parties; and
(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1).

■■ Defendants argue that plaintiff's dilution claims must fail because plaintiff's M2 mark is not famous. Furthermore, defendants argue that plaintiff failed to present evidence on this issue. Plaintiff claims that it has presented enough evidence on three of these eight factors to raise a triable issue of fact. Plaintiff argues that it has presented evidence on the acquired or inherent distinctiveness of its mark; the duration and extent of the use of the M2 mark in connection with its products; and the geographical extent of use. Plaintiff may have presented evidence as to these factors, but it is not enough to survive this motion. As noted above, it is true that plaintiff's mark is distinctive and that plaintiff has used the mark continually since 1991. However, plaintiff has not shown that its use has been geographically extensive. Plaintiff claims it has promoted its products with the mark nationally and internationally. Its evidence, however, simply does not show such a wide geographic range of use. Plaintiff does not offer any cases which show that a mark of similar use was considered famous.

Furthermore, plaintiff's greatest use of the mark has been with its CD–ROM products. As noted, RLMS has been licensed to thirteen customers, whereas its CD–ROM's have been distributed at concerts, at record stores, and on the web.

This means that, to the extent that plaintiff's mark is famous, it has become so since the time defendants entered the market. In 1996, plaintiff had not distributed any CD–ROM's.

Defendants offer survey evidence that the M2 trademark is not famous. A survey was conducted telephonically with 501 random respondents. The M2 mark received "a very low-level awareness" according to defendants' expert. *See* Defense Exhibit 31:2369. The awareness factor was 12% on an aided basis. The expert notes that 11% responded favorably to completely fictitious marks, and that a broad range of products were connected with the M2 mark. Only 1% connected M2 with CD's or music videos.

Plaintiff's mark is not famous, and more importantly, it *was* not famous at the time defendants entered the market. Given the admissible evidence submitted in connection with this motion, no reasonable jury could conclude otherwise. Defendants are entitled to summary judgment on plaintiff's dilution claims.

## IV.

### Conclusion

In the Court's prior order, we found that plaintiff had shown a likelihood of succeeding on the merits of his claims. The consideration of a more complete record leads the Court to reach a different conclusion at this stage of the litigation. In 1996, defendants began using the M2: Music Television mark. At that time, plaintiff was using the M2 mark in commerce with only one product, its RLMS accounting program. Because its RLMS system is not related to defendants' M2: Music Television, there is no likelihood of confusion between the source of the two products. In sum, in adopting the M2: Music Television mark, defendants did not infringe plaintiff's M2 trademark and no reasonable jury could conclude otherwise. While plaintiff may have hoped to become a producer of interactive music and video CD–

ROM's, and indeed, may have recently achieved this goal, the evidence clearly shows that plaintiff had not yet produced any such products with the M2 label in 1996. Because trademark law protects prior use, plaintiff cannot claim protection for products he had not yet placed on the market. Accordingly, defendants' motion for summary judgment is **GRANTED.** Judgment shall be entered in favor of defendants. Defendants shall recover their costs of suit as allowed by law.

**IT IS SO ORDERED.**